**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
WILLIAM CHARLES BOX,

                    Plaintiff,

          -against-

CAROLYN W. COLVIN, as
COMMISSIONER OF SOCIAL SECURITY

                    Defendant.
-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-1317 (ADS)

<u>**APPEARANCES:**</u>

**Law Office of Sharmine Persaud**
*Attorneys for the Plaintiff*
11-05 Route 110
Farmingdale, NY 11735
          By: Sharmine Persaud, Esq., Of Counsel

**United States Attorney's Office, EDNY**
*Attorneys for the Defendant*
610 Federal Plaza
Central Islip, New York 11722
          By:  Vincent Lipari, Assistant United States Attorney

**SPATT, District Judge**.

          The Plaintiff William Charles Box (the "Plaintiff") commenced this action pursuant to

the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final determination by

Carolyn W. Colvin, the Commissioner of Social Security (the "Commissioner"), that he was

ineligible for Social Security disability benefits.  Presently before the Court is the

Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure ("Fed. R. Civ. P.") 12(c).  Also before the Court is the Plaintiff's motion for judgment

on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons set forth below, the

Commissioner's motion  is denied and the Plaintiff's motion is granted in part and denied in part.

# I.     BACKGROUND

## A. Procedural History

On  November 16, 2009, the Plaintiff filed an application for Social Security disability insurance benefits, alleging a disability and inability to work since January 16, 2009 due to the impairment of his right knee.  (Administrative Record ("AR") at 83–84, 101–106, 108–110.) On February 8, 2010, the Social Security Administration ("SSA") denied his application and the Plaintiff made a timely request on February 12, 2010 for a hearing before an Administrative Law Judge.  (AR 50–51.)

On July 13, 2010, a hearing was held before Administrative Law Judge ("ALJ") Andrew S. Weiss.  (AR at 21–34.)  At the hearing, the Plaintiff was represented by counsel.  (AR at 21–34.)  Only the Plaintiff testified.  (AR at 21–34.)  Following the hearing and a review of the record by the ALJ, in a decision dated August 6, 2010, the ALJ denied the Plaintiff's claim for disability benefits.  (AR at 12–17.)

On August 20, 2010, the Plaintiff, through his attorney, sought review of the ALJ's decision by the Appeals Council.  (AR at 7–8.)  On February 16, 2012, the Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's August 6, 2010 decision the final decision of the Commissioner in the Plaintiff's case.  (AR at 1–4.)  On or about March 15, 2012, the Plaintiff commenced the present appeal from that decision.

## B.  The Administrative Record

### 1.   The Plaintiff's Non-Medical Background

The Plaintiff was born on September 18, 1958 and is fifty-five years of age.  (AR at 24.) In the tenth grade, he left high school because he was having problems in his classes and eventually he went to work as a carpenter.  (AR at 25.)

For twenty-eight years, from 1981 through 2009, the Plaintiff worked as a union carpenter.  (AR at 25–27, 113.)  As a union carpenter, the Plaintiff worked on major construction projects on Long Island and in Manhattan, including AirTrain, which went from Jamaica to Manhattan, and the World Trade Center.  (AR at 26.)  His salary was approximately $135,000 a year and his job involved hanging cabinets; installing wood floors and office furniture; and performing work in carpentry for drop ceilings and framing for drywall.  (AR at 113.)  He worked ten hours a day, five days a week and was required to walk for a total of eight hours a day; stand for a total of 1.5 hours a day; climb for a total of 2.5 hours a day; stoop for a total of four hours a day; kneel for a total of one hour a day; crouch for a total of four hours a day; handle, grab or grasp big objects for a total of 7. 5 hours a day; reach for a total of four hours a day; write, type or handle small objects for a total of two hours a day; and frequently lift heavy tools, construction materials and office furniture, generally weighing twenty-five pounds, on a daily basis around work sites.  (AR at 113.)   The heaviest weights the Plaintiff lifted was one hundred pounds, or more.  (AR at 113.)

According to the Plaintiff's Function Report, which the Plaintiff submitted on December 23, 2009 in connection with his claim for social security disability insurance benefits, his injury impacted his ability to lift; stand; walk; climb stairs; kneel; and squat.  (AR at 105.)  After his knee surgery, the Plaintiff initially used crutches, and then, when he was no longer using crutches, had to "shift [his] weight" in order to walk.  (AR at 106.)  The Plaintiff could only walk for about ten minutes before needing to stop to take a fifteen-minute rest break.  (AR at 106.)

While the Plaintiff could still bathe, groom and dress himself, he had trouble bending his knee when he had to put his sneakers on.  (AR at 101–02.)  Further, before his injury, the Plaintiff was able to hike; take walks; go fishing, including surf fishing; and stand for long

periods of time.  (AR at 101, 104.)  However, after his injury, he was allegedly no longer able to engage in these activities.  (AR at 101, 104.)  In addition, the Plaintiff reported that he was unable to do house or yard work because of the pain in his knee.  (AR at 102.)  The Plaintiff went outside when he had to, such as to go to doctor appointments or to therapy two times a week.  (AR at 103–04, 110.)  He did drive a car, although his wife did the shopping for their household.  (AR at 103–04, 110.)  The Plaintiff is only able to prepare quick meals for himself on a daily basis, which generally took him five minutes to prepare.  (AR at 102.)  Otherwise, his wife prepared food for him.  (AR at 102.)  The Plaintiff engaged in unspecified social activities about two times per week, but stated he was less active since his injury.  (AR at 105.)

### 2.  The Medical Evidence

On Friday, January 16, 2009, the Plaintiff was involved in a work-related accident which caused him to sustain an injury to his right knee.  (AR at 164-165, 182.)  In this regard, while on the job, he slipped and fell on a slippery surface, twisting his right knee.  (AR at 173, 178, 182.)  Immediately after the accident, the Plaintiff drove himself to the Emergency Room at New York Hospital Queens.  (AR at 173, 182–83.)  He stated that when he fell, he "felt a pop in [his] right knee."  (AR at 173, 182–83.)  According to hospital medical records, the Plaintiff had pain and swelling in his right knee and was unable to bear weight on his right leg.  (AR at 173, 182–83.)  X-rays of the Plaintiff's right knee were negative for fractures.  (AR at 173.)  The Plaintiff was discharged the same day, January 16, 2009, and directed to follow up with his doctor in one day's time.  (AR at 183.)  He was released with an immobilizer and assistive devices.  (AR at 164.)  He was also provided a referral list of doctors specializing in orthopedics.  (AR at 185.)  In addition, the Plaintiff was given crutches and a splint and was advised to take Motrin for the pain and swelling in his right knee.  (AR at 173, 183.)  However, he was cleared to return to work on

Sunday, January 18, 2009, provided it was "[l]ight active duty" and involved no weight bearing. (AR at 187.)

Four days later, on January 20, 2009, the Plaintiff visited Dr. Adam Carter, MD ("Dr. Carter"), of Downtown Physical Medicine Rehabilitation.  (AR at 173–75.)  In his initial consultation notes, Dr. Carter reported that while the Plaintiff said that his pain had decreased since the accident, his sleep was affected by the pain, in that he had difficulty falling asleep and awoke at night due to the pain.  (AR at 173.)  The Plaintiff also had not missed any time at work due to his injury.  (AR at 174.)

Dr. Carter examined the Plaintiff's lumbar spine and lower extremities.  (AR at 174.)  His examination of the Plaintiff's lumbar spine revealed that the Plaintiff "was minimally impaired with mobility[;] . . . was restricted to the right with squatting[;] [and] required the use of crutches."  (AR at 174.)  Dr. Carter also noted that the Plaintiff's "[g]ait was antalgic, favoring the right" and his "[t]andem gait was abnormal."  (AR at 174.)  However, the Plaintiff had a normal range of motion; his muscle testing was normal; he was able to dress and undress with no difficulty; and his lumbar spine indicated a normal lordosis.  (AR at 174.)

In addition, Dr. Carter evaluated the Plaintiff's lower extremities and concluded that "[a]ll joints of the lower extremities show range of motion was within normal limits except for the right knee."  (AR at 174.)  In this regard, "[p]alpatation reveal[ed] right medial joint line, lateral joint line and peripatella tenderness."  (AR at 174.)  Further, "[m]uscle testing was decreased at the right knee," but "sensation was within normal limits."  (AR at 174.)

Following his examination of the Plaintiff, Dr. Carter found that the Plaintiff was suffering from (1) a sprain and strain of his right knee; (2) a medial meniscal tear of the right knee; and (3) an internal derangement of the right knee.  (AR at 175.)  He instructed the Plaintiff

to undergo an MRI of his right knee and to be reevaluated once the MRI was performed.  (AR at 175.)

The next day, January 21, 2009, the Plaintiff underwent an MRI of his right knee.  (AR at 166, 168–69.)  The MRI revealed the following:

1. [An] [e]xtensive suprapatellar joint effusion.
2. [A] [f]ocal torn cartilage of the medial fermoral condyle seen in the medical recess of the suprapatellar bursa.  The torn cartilage donor site extend[ed] over a length of approximately 1.5 cm.
3. [A] [r]adial tear involving the inner margin of the posterior horn of the medial meniscus.  A peripheral vertical tear [was] also identified in the posterior horn.
4. [A] [c]omplete tear of the mid and proximal fibers of the anterior cruciate ligament [("ACL")].  A partial tear of the distal fibers of the anterior cruciate ligament [was] seen near the tibial insertion.
5. [A] [f]ocal subchondral fracture involving the lateral femoral condyle laterally with associated marrow edema.  Edema [was] also identified in the lateral tibial condyle posteriorly.  No subchondral fracture for the tibial plateau [was] seen on [the] study.
6. [A] Grade 1 sprain of the lateral collateral ligament [("LCL")].

(AR at 169.)

According to Dr. Carter's notes from the Plaintiff's January 27, 2009 follow-up visit, Dr. Carter observed during the Plaintiff's physical examination "tenderness to palpitation over the right knee joint line" and that the Plaintiff "continue[d] to lack approximately 5 degrees of full extension and [had] flexion to 135 degrees."  (AR at 166.)  He also diagnosed the Plaintiff's January 21, 2009 MRI of his right knee, which he found revealed "an extensive suprapatellar fusion, focal point cartilage of the medial femoral condyle, a radial tear of the inner margin of the posterior horn of the medical meniscus with a peripheral vertical tear also identified in a posterior horn and complete tear of the mild and proximal fibrous of the ACL with a partial tear of the distal fibrous of the ACL near the tibial insertion as well."  (AR at 166.)  In addition, Dr.

Carter noted that the MRI showed "a subfocal subchondral fracture involving the lateral femoral condyle laterally with associated marrow edema" and "a grade I strain of the collateral ligament." (AR at 166.) Dr. Carter's impressions were (1) traumatic arthritis; (2) internal derangement of the right knee; (3) medial meniscus tear; and (4) ACL tear. (AR at 166.) Based on his examination, Dr. Carter concluded that the Plaintiff "[was] considered partially disabled" and "cleared [him] to continue light duty at a sedentary level." (AR at 167.)

Also on January 27, 2009, at some time after his follow-up appointment with Dr. Carter, the Plaintiff had an initial visit with Dr. Jeffrey Rosen, MD ("Dr. Rosen"), an orthopedic surgeon. (AR at 164–65.) In his initial visit notes, Dr. Rosen noted that the Plaintiff was limping during the visit, but was in no apparent distress. (AR at 164.) Having reviewed the MRI scan of the Plaintiff's knee, Dr. Rosen assessed that the Plaintiff had suffered an ACL tear, medial meniscal tear, medial femoral condyle lesion, lateral femoral condyle lesion and LCL sprain to his right knee. (AR at 164.) Dr. Rosen recommended that the Plaintiff undergo ACL reconstruction and medial meniscal repair as opposed to medial meniscectomy. (AR at 164.) According to Dr. Rosen's notes, the Plaintiff agreed to proceed with Dr. Rosen's surgery recommendation. (AR at 165.)

On March 6, 2009, Dr. Rosen performed an ACL reconstruction and partial meniscectomy on the Plaintiff's right knee. (AR at 155–58) During the surgery, Dr. Rosen discovered a "chondroplasty medial femoral condyle" on the Plaintiff's right knee. (AR at 155).

On April 6, 2009, the Plaintiff saw Dr. Rosen for a follow-up exam. (AR at 142, 151.) According to the continuity of care record, the Plaintiff was doing well and had no complaints. (AR at 142.) Further, the Plaintiff was "[a]ble to straight leg raise and ambulate[ ] without crutches." (AR at 142.)

Dr. Rosen reviewed with the Plaintiff "alternative treatment options for the medial femoral condyle lesion" in his right knee, including a "unicompartmental resurfacing procedure" and "the eventual need for total knee replacement." (AR at 142.) The Plaintiff agreed to undergo a resurfacing procedure. (AR at 142.) As such, the Plaintiff and Dr. Rosen planned for the Plaintiff to complete six weeks of a physical therapy program and home exercise program in order to recover from the March 6, 2009 procedure before undergoing a second surgery on his knee. (AR at 142.)

On April 27, 2009, the Plaintiff had an additional follow-up visit with Dr. Rosen. (AR at 151.) In the continuity of care record and Dr. Rosen's follow-up visit notes, Dr. Rosen noted that the Plaintiff was "doing well with physical therapy" and "doing well postop," but was experiencing "occasional clicking in [his] knee." (AR at 150–51.) Dr. Rosen placed the Plaintiff in a bauerfind brace and gave him instructions on its wear and usage. (AR at 150–51.) Dr. Rosen stated that he was awaiting authorization from his Workers Compensation provider to perform a joint resurfacing procedure on the Plaintiff's right knee. (AR at 150.)

On July 27, 2009, the Plaintiff once again had a follow-up visit with Dr. Rosen. (AR at 146, 149, 151.) According to the continuity of care record and Dr. Rosen's follow up visit notes, while the Plaintiff was "doing well with physical therapy" and "doing well postop," he was still experiencing "occasional mechanical symptoms of catching." (AR at 149, 151.) Dr. Rosen did not elaborate as to what he meant by "catching," but opined that the cause of the catching may have been "possible patellofemoral versus medial femoral condyle osteochondral lesion." (AR at 146, 149, 151.) The Plaintiff informed Dr. Rosen that his Workers Compensation provider had denied his undergoing further surgery at that time. (AR at 149, 151.)

Further, in the continuity of care record for the July 27, 2009 visit, Dr. Rosen wrote that the Plaintiff should "[a]ttempt return to work light duty." (AR at 146, 149.) In this regard, he concluded that the Plaintiff "may attempt return to work light duty and if unable to tolerate or increased mechanical symptoms occur, I would recommend requesting the authorization for joint resurfacing." (AR at 146.) Dr. Rosen also directed the Plaintiff to continue using the bauerfind brace for a total of six months after his March 6, 2009 operation. (AR at 146.)

The Plaintiff had another follow-up visit with Dr. Rosen on September 10, 2009. (AR at 143.) At this visit, the Plaintiff complained of "worsening pain over the medial aspect of the knee with increased incidence of catching and clicking over the medial compartment of the knee." (AR at 143.) According to the continuity of care record, the Plaintiff informed Dr. Rosen that he would be attending a hearing to challenge his Workers Compensation provider's denial of further surgery at that time. (AR at 143.) In addition, he reported to Dr. Rosen that his Workers Compensation provider recommended that the Plaintiff continue with light duty work. (AR at 143.)

In his treatment notes, Dr. Rosen noted a weakening of the Plaintiff's quadriceps and persisting atrophy. (AR at 143.) He also noted flexion was limited to 120 degrees. (AR at 143.) No focal or motor sensory deficits were found and the neurovascular examination was distally intact. (AR at 143.) Dr. Rosen's impression was that the Plaintiff was "[s]table postop with increasing pain and mechanical symptoms of catching," caused by "possible patellofemoral versus medial femoral condyle osteochondral lesion." (AR at 143.) Nevertheless, Dr. Rosen still recommended that the Plaintiff "[a]ttempt return to work light duty," as well as continue with his physical therapy and home exercise program. (AR at 143.) Dr. Rosen continued to recommend

authorization by the Plaintiff's Workers Compensation provider for joint resurfacing because of the Plaintiff's worsening of pain. (AR at 143.)

On December 17, 2009, the Plaintiff saw Dr. Benizon Benatar, MD ("Dr. Benatar"), who specializes in orthopedic surgery, for an orthopedic consultation. (AR at 198, 224.) In his notes, Dr. Benatar wrote that "a lesion involving the medical femoral condyle, measuring about 2 to 2.5 cm in size was [ ] observed" and was present during the March 6, 2009 surgery. He also noted that the Plaintiff needed additional surgery to repair the lesion. (AR at 198, 224.) According to Dr. Benatar, the lesion was not repaired during the initial surgery due to the possible risk of it interfering with the ACL reconstruction and meniscus repair. (AR at 198, 224.) He recommended the Plaintiff undergo an arthroscopic procedure in addition to microfracture surgery of his right knee. (AR at 198, 224.) Like Dr. Rosen, Dr. Benatar also warned that the Plaintiff would eventually require a knee replacement. (AR at 198, 224.)

On January 8, 2010, at the request of the New York State Division of Disability Determination, Dr. Erlinda Austria, MD ("Dr. Austria"), performed an orthopedic examination of the Plaintiff. (AR at 199–201.) The record does not indicate whether Dr. Austria specialized in orthopedics.

During this consultation, the Plaintiff did not use any assistive device during the consultation and did not appear to be in acute distress. (AR at 199, 200.) She observed that the Plaintiff "walk[ed] with a limp favoring his right leg[ ] [and] [c]ould not walk on his heels." However, he was able to walk on his toes; fully squat; rise from a chair without difficulty; and change for the exam and get on and off the exam table without help. (AR at 200.) In her notes, Dr. Austria noted the Plaintiff's past medical history, as well as his physical therapy schedule, and indicated that the Plaintiff took pain medication. (AR at 199.)

The Plaintiff reported that on a good day, his pain level was 3/10 and that he could carry less than five pounds and could lift ten to fifteen pounds. (AR at 199.) The Plaintiff also stated that he had no problem sitting; could stand anywhere between ten and fifteen minutes; could walk for ten to fifteen minutes; and could climb up to ten steps at a time. (AR at 199.) The Plaintiff's daily activities included watching television, reading and socializing with friends. (AR at 200.) He stated that his wife did "most of the cooking, cleaning, laundry, and shopping." (AR at 200.) The Plaintiff informed Dr. Austria that he was able to shower and dress himself. (AR at 200.)

Dr. Austria examined the Plaintiff's lower extremities and found that the Plaintiff had a full range of motion of his hips, knees and ankles bilaterally; strength 5/5 in proximal and distal muscles bilaterally; no muscle atrophy; no sensory abnormality; reflexes that were physiologic and equal; and no joint effusion, inflammation or instability. (AR at 201.) She concluded that the Plaintiff was "[s]table" but "may need another surgery." (AR at 201.) She opined that the Plaintiff "[had] no restrictions to activities of the head, neck and upper extremities including fine motor movement," as well as "no restriction to squatting, bending, prolonged sitting, standing, and walking." (AR at 201.) Further, she found that the Plaintiff "noted to have none to minimal restriction to activities involving [his] right knee." (AR at 201.)

On January 19, 2010, the Plaintiff was again examined by Dr. Benatar. (AR at 223.) According to Dr. Benatar's notes, the Plaintiff was complaining of pain in his right knee. (AR at 223.) He explained to Dr. Benatar that the prior day, January 18, 2010, he had been "doing a squatting program when he felt a sharp pain in his right knee." (AR at 223.) As a result, he stopped the program. (AR at 223.) However, the Plaintiff told Dr. Benatar that "he [felt] much better although he [was] still uncomfortable. (AR at 223.) On exam, Dr. Benatar found that the

Plaintiff's "knee [was] stable" and its range of motion normal, but that there was "some tenderness in the medial compartment." (AR at 223.) Dr. Benatar advised the Plaintiff to cease his physical therapy and wait a week before returning to it. (AR at 233.) He also informed the Plaintiff that if his condition did not improve, an MRI scan of his right knee would be required. (AR at 223.)

On February 5, 2010, a Physical Residual Functional Capacity ("RFC") Assessment was completed for the Plaintiff by "S. Glick," who was a non-medical professional for the SSA called a Single Decision Maker ("SDM"). (AR at 203–08.) According to the RFC Assessment, the Plaintiff had the following exertional limitations: he was limited in the category of occasional lifting and/or carrying, including upward pulling, in that he could only occasionally lift up to twenty pounds; he was limited in the category of frequent lifting and/or carrying, including upward pulling, in that he could only frequently lift and/or carry up to ten pounds; he was limited in the category of standing and/or walking, with normal breaks, in that he could only stand and/or walk, with normal breaks, for a total of about six hours in an eight hour workday; he was limited in the category of sitting, with normal breaks, in that he could only sit, with normal breaks, for a total of about six hours in an eight hour workday; and he was limited in the category of pushing and/or pulling, including operation of hand and/or foot controls, in that he was limited in his lower extremities. (AR at 204.)

In addition, the SDM reported that the plaintiff could shower and dress himself, but that he walked with a limp favoring his right leg and could not walk on his heels. (AR at 205.) However, the Plaintiff was able to walk on his toes; squat fully; change and get on and off the exam table without help; and rise from a chair without difficulty. (AR at 205.) The SDM also

found that the Plaintiff had "strength 5/5" with respect to "all four extremities" and had full range of motion for all joints. (AR at 205.)

Further, the RFC Assessment listed the Plaintiff's postural limitations as being able to frequently climb ramp and stairs and occasionally balance; stoop; kneel; crouch; and crawl. (AR at 205.) The SDM noted that the Plaintiff could either occasionally climb ladders, ropes and scaffolds, or else never climb them. (AR at 205.) He further noted that the Plaintiff had no manipulative limitations; visual limitations; communicative limitations; or environmental limitations. (AR at 205–06.)

In the RFC Assessment, the SDM found that the "statement in the application that [the Plaintiff] 'cannot walk, stand or sit for long periods of time' is non-quantitative and not readily translated into quantitative terms." (AR at 207.) Although the Plaintiff told the SDM that "he [could] lift 10-15 lbs[,] [ ] carry 5 lbs . . .[and] stand for 10 to 15 minutes[,]" the SDM stated that "there [was] no evidence to support a finding that [those] [were] his limits of exertional capability." (AR at 207.) As such, the SDM concluded that "the indication that the [Plaintiff] [could not] lift/carry and stand more than he indicated is therefore deemed not credible." (AR at 207.)

The SDM noted that the Plaintiff's treating physician, Dr. Benatar, had reached conclusions about the Plaintiff's limitations or restrictions which were significantly different than his findings. (AR at 207.) The SDM concluded that the Plaintiff could perform other work and denied the Plaintiff's claim. (AR at 208.)

About a month later, on February 22, 2010, the Plaintiff again visited Dr. Benatar's office for an examination. (AR at 222.) In his notes, Dr. Benatar wrote that the Plaintiff's knee was "stable" and "no longer collapsing," and that the Plaintiff was comfortable with standing and

walking. (AR at 222.) After the physical exam, Dr. Benatar recommended that the Plaintiff continue with his physical therapy program for at least an additional month and that he would re-exam the Plaintiff in one month's time. (AR at 222.) Dr. Benatar stated that the Plaintiff "had a serious injury to his knee and [was] convalescing well at [that] time." (AR at 222.) However, he opined that the Plaintiff "[was] not able to [return] to work[,]" because the Plaintiff was "a carpenter and kneeling, squatting, etc., are impossible to do after this type of injury." (AR at 222.)

As directed, on March 24, 2010, the Plaintiff returned for another visit with Dr. Benatar. (AR at 221.) According to Dr. Benatar's notes, the Plaintiff "did have an osteochondral lesion of his femoral condyle identified at the time of [his first knee] surgery [on March 6, 2009]" and that it "left him with a significant deficit in his knee." (AR at 221.) Dr. Benatar "noted that there [was] still crepitus present during [range of motion] of his knee" and that "the remedial compartment of the knee remain[ed] tender." (AR at 221.) In addition, the Plaintiff "lack[ed] the final 30 degrees of flexion of his knee," in that while "full flexion is usually to 140–150 degrees," the Plaintiff could only "flex to roughly 110 degrees at [that] time." (AR at 221.)

The Plaintiff's "knee [had] crepitus, it [was] tender; it swell[ed] periodically; [and] [the Plaintiff] [had] difficulty with kneeling and squatting." (AR at 221.) Based on this, Dr. Benatar found that "it [did] present him with a significant disability." (AR at 221.) In this regard, Dr. Benatar believed that the Plaintiff "essentially [had] a total disability because of his injury" and was "certainly not able to work as a carpenter[,]" since "he was not able to gain employment in areas that requir[e] kneeling, standing, squatting, etc." (AR at 221.) While Dr. Benatar noted that the Plaintiff "[did] use medication to relieve pain," the medication "interfere[d] with cognizance and function." (AR at 221.) Therefore, Dr. Benatar concluded that the Plaintiff

"suffered permanent disability as a result of the injury to his knee" and that "it [was] a very significant disability and it [was] permanent." (AR at 221.)

On April 29, 2010, Dr. Benatar again examined the Plaintiff. (AR at 220.) The Plaintiff was complaining of pain in his right knee. (AR at 220.) In his notes for the visit, Dr. Benatar reported that he had received authorization from the Plaintiff's Workers Compensation provider to perform a pick arthroplasty procedure on the Plaintiff's right knee. (AR at 220.) Dr. Benatar observed that the Plaintiff's "knee still [had] a +1 effusion and tenderness of the medial femoral condyle [was] still notable." (AR at 220.) The Plaintiff's surgery was to be scheduled "in [the] near future." (AR at 220.)

Also on April 29, 2010, Dr. Benatar completed a medical source statement for the Plaintiff. (AR at 216–19.) Dr. Benatar described his prognosis as guarded and stated that the Plaintiff had osteoarthritis of his right knee, which caused pain; swelling; tenderness; crepitus; weakness and muscle atrophy. (AR at 216–17.) With respect the Plaintiff's limitations, Dr. Benatar found that the Plaintiff had no limitations in sitting, but could only stand and walk for less than two hours in an eight hour workday and could only lift and carry less than ten pounds. (AR at 218–19.) Moreover, Dr. Benatar noted that the Plaintiff needed a job that permitted him to shift positions at will from sitting, standing or walking; would need to take unscheduled breaks hourly during an eight-hour working day; would likely have to be absent from work about twice a month due to his impairments; and could only stand continuously for fifteen minutes at a time. (AR at 218–19.) In addition, according to Dr. Benatar, the Plaintiff could never stoop or crawl. (AR at 219.) However, the Plaintiff did not require an assistive device to walk and could reach and feel frequently, as well as bend occasionally. (AR at 218–19.)

On July 19, 2010, almost a week after the Plaintiff's July 13, 2010 hearing before the ALJ, discussed below, the Plaintiff underwent a second surgery on his right knee. (AR at 134.) In this regard, Dr. Benatar performed (1) an arthroscopy on his right knee; (2) a partial meniscectomy; and (3) chondroplasty. (AR at 134.) In a letter dated January 12, 2011, the Plaintiff submitted to the Appeals Council the operative report from the July 19, 2010 procedure. (AR at 131–133.)

### 3. The July 13, 2010 Hearing Testimony

As stated above, on July 13, 2010, there was a hearing conducted by the ALJ. (AR at 21–34.) At the hearing, the Plaintiff was represented by an attorney. (AR at 21–34.)

The Plaintiff testified that he was born on September 18, 1958. (AR at 24.) He never graduated from high school, but only completed a tenth grade education. (AR at 25.) After he left school, the Plaintiff immediately went to work in construction as a carpenter. (AR at 25.)

The Plaintiff explained that he worked as a union carpenter for twenty-eight years for a "big company" called "Skanska," which was a non-American company based in Sweden. (AR at 26.) Skanska business involved major construction projects, including the AirTrain and the World Trade Center, and several power plants all over Long Island. (AR at 26–27.) The Plaintiff worked for Skanska on Long Island and Manhattan and it was while working on the World Trade Center project that the Plaintiff suffered the subject injury to his right knee. (AR at 26.)

According to the Plaintiff, he could not work because of his knee and that he had been advised by his doctor that it would not tolerate the pressure any longer. (AR at 27.) In this regard, the Plaintiff testified that with respect to his right knee, "[t]he ACL was ripped," which had to be replaced, and the meniscus had been repaired. (AR 27.) Further, he advised the ALJ

that the following Monday, July 19, 2013, he would be undergoing another operation in order to replace a large piece of cartilage that the doctors had taken out during his first surgery, which needed replacing. (AR at 27.) The Plaintiff explained that his doctor was going to attempt to grow new cartilage so as to postpone the Plaintiff's need for a total knee replacement. (AR at 28.)

The Plaintiff's counsel argued that the Plaintiff was only capable of doing sedentary work and that given his twenty-eight year background working in carpentry, "he [had] no transferrable skills for a desk job, and least of all with a 10th grade education, but more importantly because his previous work was . . . medium to heavy [ ] in exertional strength." (AR at 28.) When questioned by the ALJ about whether the Plaintiff could do light work, the Plaintiff's counsel stated the Plaintiff could not and referred to Dr. Benatar's findings. (AR at 28–29.)

The ALJ examined the Plaintiff with respect to Dr. Benatar. (AR at 29.) The Plaintiff informed the ALJ that Dr. Benatar would be performing the second surgery on the Plaintiff's right knee. (AR at 29.) He also confirmed that Dr. Benatar believed that the Plaintiff could only stand for fifteen minutes at a time. (AR at 29.)

The Plaintiff testified the he could approximately stand for fifteen minutes, as his "knee start[ed] getting sore if [he was] walking around." (AR at 29.) While he used to be able to lift 150 pounds when he was working, the Plaintiff stated that his doctor had instructed him not to do any lifting, because it would cause stress to his knee and may result in further injury. (AR at 29.) According to the Plaintiff, "[t]he repairs [made to his knee during his first surgery] have been made [ ] just so [he] [could] move around," but his knee "[would not] hold up to the stress" of lifting. (AR at 29.)

In addition, the Plaintiff testified that he would not be able to go back to work after the second knee surgery because although the procedure would allow him to avoid getting a knee replacement within a short time, it would "still leave the knee weak."  (AR at 30.)  He explained that he was "missing a piece of cartilage" and that while his doctor was "going to try to grow new cartilage," his "knee still [would not] hold up to the pressure."  (AR at 30.)  Apparently, this was "why [Dr. Benetar] said [the Plaintiff's] career was over."  (AR at 30.)

During examination by his attorney, the Plaintiff stated that his right knee grew sore when he sat for about a half hour, requiring him to either "start [ ] exercising while [ ] sitting" or "walk around for a little bit to stretch it out."  (AR at 31.)  On those occasions when the Plaintiff walked around to relieve his right knee, he "usually just walk[ed] around the house[,] . . .back and forth until it [got] comfortable, maybe a couple hundred feet[.]"  (AR at 31.)  Then, he would relax his knee.  (AR at 31.)  The Plaintiff claimed that if he was standing in one spot, he would need to "lean on something."  (AR at 31.)  The Plaintiff admitted that he could brush his teeth and wash his hands.  (AR 31–32.)  He was also able to apply enough pressure to the gas pedal and the brake pedal in order to drive.  (AR at 32.)

According to the Plaintiff, Dr. Benatar advised him that he could no longer do his job, because it put too much pressure on his knee.  (AR at 32.)  Dr. Benatar also encouraged the Plaintiff to continue with physical therapy, because it was important, and to exercise whenever he could so as to keep in shape.  (AR at 32.)  However, at the time of the hearing, the Plaintiff was no longer participating in a physical therapy program because his Workers Compensation provider had disallowed coverage for it.  (AR at 32.)  Concerning the home exercises that Dr. Benatar directed the Plaintiff to do, the Plaintiff was told that when sitting, he should "hold [his] leg straight out [and] tighten it up," and then lower it before putting the leg in a resting position.

(AR at 32.)  Apparently, this exercise was designed "to help keep the [Plaintiff's] muscle tone." (AR at 33.)

With respect to the upcoming July 19, 2010 surgery, the Plaintiff relayed that Dr. Benatar was "going to punch holes in the bone where the cartilage [was] missing, and then [the Plaintiff] should grow new cartilage."  (AR at 33.)  According to the Plaintiff, Dr. Benatar told him that the surgery had an eighty percent success rate.  (AR at 33.)  The Plaintiff further testified that "right now" he had "bone on bone" at his right knee, but the procedure would "help it out so it wouldn't be as bad, it wouldn't wear as bad, and it would be a little while longer before I'd have to get the total knee replacement."  (AR at 33.)  Concerning recuperation, the Plaintiff stated he would be on crutches for three to four weeks, followed by therapy.  (AR at 34.)

## C.  The ALJ's Findings

On August 6, 2010, the ALJ issued his decision.  (AR at 12–17.)  The ALJ addressed whether the Plaintiff was disabled under §§ 216(i) and 223(d) of the Social Security Act.  (AR at 20.)  He also noted that the Plaintiff was required under §§ 216(i) and 223 of the Social Security Act to establish that he was disabled on or before December 31, 2013, which was the date he was last insured for disability insurance benefits, in order to be entitled to a period of disability and disability insurance benefits.  (AR at 12.)  "After careful consideration of all the evidence, the [ALJ] conclude[d] the [Plaintiff] was not under a disability within the meaning of the Social Security Act from February 1, 2009, through the date of this decision."  (AR at 12.)  The Court notes that the ALJ suggested that the onset date had been amended from January 16, 2009 to February 1, 2009, but the Court finds no other document in the Administrative Record reflecting when or why this change to the onset date was made.

In particular, the ALJ found that:

1.  The [Plaintiff] [met] the insured status requirements of the Social Security Act on December 31, 2013.
2.  The [Plaintiff] did not engage in substantial gainful activity since February 1, 2009, the amended alleged onset date.
3.  The [Plaintiff] had the following severe impairments: arthritis of the right knee, status post ACL and medial meniscus tear. The above impairments cause[d] more than minimal limitation in the [Plaintiff's] ability to perform basic work activities.
4.  The [Plaintiff] did not have an impairment or combination of impairments that [met] or medically equal[ed] one of the listed impairments in 20 CFR Part 404 . . . . In this connection, listed impairments under section 1.00 (musculosketal) were considered in particular, however, the requisite criteria for the relevant listings are absent from the medical record.
5.  After careful consideration of the entire record, the [ALJ] [found] that the [Plaintiff] had the [RFC] to perform the full range of light work[.]

(AR at 14, citations omitted.)

The ALJ explained that "[i]n making [his] finding [concerning the Plaintiff's RFC to perform the full range of light work], [he] considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical and other evidence," as well as opinion evidence. (AR at 15.) The ALJ reasoned that while "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms" of pain and inability to move his right knee, "the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ ] [RFC] assessment" that the Plaintiff could perform light work. (AR at 15.)

In this regard, the ALJ found that "[i]n terms of the [Plaintiff's] alleged inability to work due to an ACL tear of the right knee and arthritis, the evidence show[ed] he [ ] had pain and stiffness with some restriction of activities, but none that would preclude him from performing at

least light work." (AR at 15.) In addition, although the Plaintiff claimed he was unable to sit for prolonged periods of time, the ALJ pointed out that "he testified that he sits comfortably to drive and uses his right leg." (AR at 16.)

Further, the ALJ acknowledged that with respect to the opinion evidence, he gave "considerable weight . . . to the consultative examiner's opinion that the [Plaintiff] [had] no exertional limitations as it was based on clinical findings." (AR at 16.) He highlighted that "Dr. Austria specializes in orthopedics, the precise area in which the [Plaintiff's] impairment lie[d]." (AR at 16.) Conversely, "[l]imited weight [was] accorded to Dr. Benatar's opinion regarding the [Plaintiff's inability to stand and walk for less than two hours] as it is inconsistent with the overall medical record." (AR at 16.)

The ALJ also pointed to SDM Glick's February 5, 2010 RFC assessment, which "provided an assessment compatible with light work." (AR at 16.) Of note, the ALJ seemingly referred to the SDM as a "state agency medical consultant[ ]" and therefore treated his opinion "as expert opinion from [a] nonexaming source[ ]." (AR at 16.) According to the ALJ, the SDM's RFC assessment that the Plaintiff could perform light work "[was] supported by the opinions of the consultative examiner as well as the [SDM]." (AR at 16.)

The ALJ made the following additional findings:

6. The [Plaintiff] [was] unable to perform any past relevant work. The [Plaintiff] [was unable to perform the heavy exertional demands of his past work as a carpenter/foreman. Accordingly, the [Plaintiff] [was] unable to perform past relevant work.
7. The [Plaintiff] was born on September 18, 1958, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.
8. The [Plaintiff] [had] a limited education [was] able to communicate in English.
9. Transferability of job skills [was] not material to the determination of disability because applying the Medical-

Vocational Rules directly support[ed] a finding of "not disabled," whether or not the [Plaintiff] [had] transferable job skills.

10. Considering the [Plaintiff's] age, education, work experience, and [RFC], there [were] jobs that exist[ed] in significant numbers in the national economy that the [Plaintiff] [could] perform.

11. The [Plaintiff] [had] not been under a disability, as defined in the Social Security Act from February 1, 2009, through the date of [the] decision.

(AR at 16–17, citations omitted.)

The ALJ explained that he was required to "consider the [Plaintiff's] [RFC], age, education and work experience in conjunction with the Medical Vocational Guidelines" in order to "determin[e] whether a successful adjustment to other work can be made." (AR at 17.) In this regard, "[i]f the [Plaintiff] [could] perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either 'disabled' or 'not disabled' depending upon the [Plaintiff's] specific vocational profile." (AR at 17, citation omitted.) However, if "the [Plaintiff] [could not] perform substantially all of the exertional demands of work at a given level of exertion and/or [had] nonexertional limitations, the medical-vocational rules [would be] used as a framework for decisionmaking unless there [was] a rule that direct[ed] a conclusion of 'disabled without considering the additional exertional and/or nonexertional limitations." (AR at 17.) Then, without providing any further explanation, the ALJ concluded that "[b]ased on a [RFC] for the full range of light work, considering the [Plaintiff's] age, education and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.11." (AR at 17.)

Accordingly, the ALJ found that "[b]ased on the application for a period of disability and disability insurance benefits filed on November 13, 2009, the [Plaintiff] was not disabled under section 216(i) and 223(d) of the Social Security Act." (AR at 17.)

## II.    DISCUSSION

### A.  Standards of Review

An unsuccessful claimant for Social Security benefits may bring an action in federal district court to obtain judicial review of the denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record.  See 42 U.S.C. § 405(g); Janinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Brown v. Apfel, 174 F.3d 59, 61–62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), and requires such relevant evidence that a reasonable person "might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).

In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques; results from frequent examinations; and is consistent "with the other substantial evidence in [the] case record."  See Clark v. Commissioner of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).  When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the weight he gives the claimant's treating source's opinion."  Id.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and

evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark, 143 F.3d at 118. Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Secretary of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). A reviewing court may "enter upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decisions of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B. Analytical Framework for Determining Disability

To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). The Act also provides that the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id.

Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims, including: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" medically determinable physical impairment which will impair the claimant from doing basic work activities; (3) whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in

Appendix 1 of the regulations; (4) an assessment of the claimant's RFC and ability to continue

past relevant work despite severe impairment; and (5) an assessment of the claimant's RFC along

with age, education, and work experience.  As to the last stage of the inquiry, the burden shifts to

the ALJ to show that the claimant can perform alternative work.  See 20 C.F.R. §§ 404.1520,

416.920.

When proceeding through this five step analysis, the ALJ must consider the objective

medical facts; the diagnoses or medical opinions based on these facts; the subjective evidence of

pain and disability; and the claimant's educational background, age, and work experience.

Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

**C.  As to Whether the ALJ's Decision to Give Considerable Weight to Dr. Austria's and the SDM's Opinions and Only Limited Weight to Dr. Benatar's Opinion Was  Supported by Substantial Evidence**

First, the Plaintiff challenges the August 6, 2010 decision by the ALJ on the ground that

he erred in giving considerable weight to the opinions of Dr. Austria and the SDM, but only

limited weight to the opinion of Dr. Benatar, even though Dr. Benatar was the Plaintiff's treating

physician.  In this regard, the Plaintiff argues that "[t]he ALJ's conclusory reasons for rejecting

Dr. Benatar's opinion are not based on substantial evidence."  (Pl. Mem., pg. 8.)

It is well-established that "the ALJ cannot rely solely on [the] RFCs [of the consulting

examiners] as evidence contradicting the Treating Physician RFC. This is because an

inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of

the treating physician."  Moore v. Astrue, No. 07-cv-5207(NGG), 2009 WL 2581718, at *10

n.22 (E.D.N.Y. Aug. 21, 2009).  Indeed, "[t]he Second Circuit has repeatedly stated that when

there are conflicting opinions between the treating and consulting sources, the 'consulting

physician's opinions or report should be given limited weight.'"  Harris v. Astrue, No. 07–CV–

4554 (NGG), 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990)). "This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" Id. (quoting Cruz, 912 F.2d at 13).

Nevertheless, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." Id.; see also 20 C.F.R. § 404.1527(c) (2)–(6). In addition, "the regulations also specify that the Commissioner will always give good reasons in [his] notice of determination or decision for the weight [he] gives claimant's treating source's opinion." Id. (citations and internal quotation marks and alterations omitted).

In his decision in this case, the ALJ simply stated that he was giving "[l]imited weight . . . to Dr. Bentar's opinion regarding the [Plaintiff's] inability to stand and walk for less than two hours," because it was allegedly "inconsistent with the overall medical record." (AR at 16.) He did not describe the ways in which Dr. Benatar's assessment was supposedly at odds with the

overall medical record or provide any sort of detailed explanation for his conclusion. Moreover, "in evaluating Dr. [Benatar's] opinion, the ALJ [did] not appear to have applied any of the factors provided by 20 C.F.R. § 404.1527(c)(2)–(6) for determining the weight to give a non-controlling opinion of a treating physician." Bunn v. Colvin, 11-CIV-6150 NGG, 2013 WL 4039372, at *7 (E.D.N.Y. Aug. 7, 2013) (citing Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998)). In this regard, the ALJ provided no consideration to the fact that the Plaintiff had visited Dr. Benatar approximately once a month for a period of a least five months, beginning in December of 2009 until the end of April of 2010, and that Dr. Benatar had performed a second surgery on the Plaintiff's right knee in July of 2010. See id. at *7–8 (finding that "the ALJ erred" where "the ALJ's decision makes no reference to the fact that [the treating physician] is a specialist who had the opportunity to examine [the plaintiff] every one to three months over the course of fourteen months.").

"Nor [did] the ALJ otherwise explain why he found the opinion of Dr. [Austria]—who examined [the Plaintiff] only one time. . . .—more convincing than the opinion of Dr. [Benatar]." Id., at *7. Indeed, the only apparent reason the ALJ gives for giving Dr. Austria's opinion considerable weight was because he assumed she "specialize[d] in orthopedics, the precise area in which the [Plaintiff's] impairment lie[d]." (AR at 16.) However, it is not clear from the administrative record that Dr. Austria was in fact a specialist in orthopedics, and in any event, Dr. Benatar also specializes in orthopedics, and yet the ALJ declined to emphasize this fact.

The ALJ also gave no consideration to the fact that Dr. Austria examined the Plaintiff prior to January 18, 2010, which is when the Plaintiff allegedly aggravated his injury by performing a squatting exercise, and how this might at least partially explain the discrepancies between Dr. Austria and Dr. Benatar's opinions. Further, he did not engage in any discussion as

to why he believed Dr. Benatar's opinion that the Plaintiff could only stand or walk for less than two hours was inconsistent with the overall medical record. See McLean v. Astrue, 08-CV-4989 NGG, 2012 WL 1886774, at *7 (E.D.N.Y. May 23, 2012) (quoting Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004)) ("It is not enough for the ALJ to simply say that [a treating physician's] findings are inconsistent with the rest of the record. The ALJ [must] provide[ ] reasons which explain that inconsistency with these other parts.") (internal brackets in original); Duncan v. Astrue, 09-CV-4462 KAM, 2011 WL 1748549, at *18 (E.D.N.Y. May 6, 2011) ("[A]lthough the ALJ gives general lip service to two factors that he may use to grant less than controlling weight to [the treating physician's] opinion under 20 C.F.R. §§ 404 .1527(d)(3)-(4)—i.e. that [the treating physician's] opinion is 'not consistent' and not 'support[ed]' by the administrative record—without more, this court cannot determine the reasons why the ALJ failed to give plaintiff's treating physician controlling weight.") (internal brackets in original).

"Where an ALJ fails to consider all of the relevant factors in deciding what weight to assign the opinion of a treating physician, the ALJ's decision is flawed." Rivas v. Barnhart, No. 01 Civ.3672 RWS, 2005 WL 183139, at *22 (S.D.N.Y. Jan. 27, 2005) (citing Schaal, 134 F.3d at 504). "Failure to provide reasons for rejecting the treating physician's opinion is a proper basis for reversal and remand." Melendez v. Astrue, No. 08 Civ. 6374(LBS), 2010 WL 199266, at *3 (S.D.N.Y. Jan. 20, 2010) (citing Johnson v. Bowen, 817 F.2d 983, 985–86 (2d Cir.1987); Mellilo v. Astrue, No. 7:06–CV–0698 (LEK/DEP), 2009 WL 1559825, at *11–12 (N.D.N.Y. Jun. 3, 2009)).

Accordingly, the Court finds that remand for failure to properly apply the treating physician rule is appropriate in this case. See, e.g., Bunn, 2013 WL 4039372, at *8 ("Remand is necessary for the ALJ to properly weigh [the treating physician's] opinion, addressing any

concerns regarding inconsistencies between [the treating physician's] disability determination and his treatment notes."); McLean, 2012 WL 1886774, at *7 ("[T]he ALJ provided nothing close to 'good reasons' for the lack of weight he gave to [the treating physician's] opinion. . . . [T]he court must now remand [this] case for a proper evaluation of [the treating physician's] opinion.").

### D. As to Whether the ALJ's RFC Assessment that the Plaintiff Could Perform the Full Range of Light Work was Supported by Substantial Evidence

"While the ALJ's failure to properly follow the treating physician rule merits remand independently," the Court nonetheless addresses whether there were any "deficiencies in the ALJ's RFC determination . . . so that," if there are, "they, too, may be remedied on remand." Bunn, 2013 WL 4039372, at *8. Specifically, the Plaintiff argues that the ALJ's RFC assessment was not supported by substantial evidence because he relied solely upon the opinions of Dr. Austria and the SDM, which was insufficient.

RFC is understood as the most that a person can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).

When the ALJ makes an assessment as to RFC, he should consider a claimant's physical abilities, mental abilities, symptomatology, including pain, and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). An RFC finding will be upheld on review when there is substantial evidence in the record to support

each requirement listed in the regulations." Desmond v. Astrue, No. 11–CV–0818 (VEB), 2012 WL 6648625, at *5 (N.D.N.Y Dec. 20, 2012).

As noted above, the ALJ concluded that the Plaintiff retained the RFC to perform light work, which is defined in 20 C.F.R. § 404.1567 as follows:

> (b)   Light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

The ALJ found that the Plaintiff could perform light work based on Dr. Austria's opinion that "the [Plaintiff] [had] no exertional limitations or restriction to activities involving the right knee" and the SDM's RFC assessment, which was "compatible with light work." (AR at 16.) However, the ALJ failed to provide "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities[,]" as required under Social Security Ruling ("SSR") 96-8p. Bunn, 2013 WL 4039372, at *8 (quoting SSR 96–8p, 1996 WL 374184, at *3 (July 2, 1996)).  In this regard, "[i]n order to evaluate a claimant's physical abilities, the SSA regulations require an ALJ assessment of the claimant's ability to sit, stand, walk, lift, carry, push, and pull." Id. (citing 20 C.F.R. § 404.1545(b)). Of importance, "[e]ach function must be considered separately (e.g., 'the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours'), even if the final RFC assessment will combine activities (e.g., 'walk/stand, lift/carry, push/pull')." Id. (quoting SSR 96–8p, 1996 WL 374184, at *5).

The Second Circuit recently found that "remand is not necessary merely because an explicit function-by-function analysis was not performed" by the ALJ. Chichoki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013.) However, the Second Circuit also held that "[r]emand may be appropriate [ ] where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id.

Here, it appears that the ALJ did assess some of the relevant functions – that is, the Plaintiff's ability to sit and stand – when determining the Plaintiff's RFC to do light work. (AR at 16.) Nevertheless, as discussed above, the ALJ made no effort to assess why he gave considerable weight to Dr. Austria's opinion that the Plaintiff had no restrictions with respect to walking or standing, even though her opinion conflicted with Dr. Benatar's opinion that the Plaintiff could not walk or stand for more than two hours in an eight hour work day and could only stand continuously for fifteen minutes at a time.

Moreover, the ALJ did not even address the Plaintiff's RFC with respect to whether he was able to lift up to twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, in accordance with 20 C.F.R. § 404.1567(b). While Dr. Austria and the SDM found that the Plaintiff could lift up to twenty pounds, Dr. Benatar had concluded that the Plaintiff was limited to lifting and carrying ten pounds of weight or less. The ALJ did not address this conflict of opinions while rendering his decision on the Plaintiff's RFC requirement, even though the Plaintiff must be able to lift up to twenty pounds in order to have the capacity to perform light work. The ALJ also never addressed Dr. Benatar's opinion that the Plaintiff would have to miss work about twice a month due to his impairment and need to take unscheduled breaks throughout the eight-hour workday.

Instructive here is the court's recent decision in <u>Toth v. Colvin</u>, 5:12-CV-1532

NAM/VEB, 2014 WL 421381 (N.D.N.Y. Feb. 4, 2014).  In <u>Toth</u>, the court held as follows:

> [T]he absence of a function-by-function assessment is not a <u>per se</u> reason for remand. However, in this case, as noted above, this [c]ourt cannot determine which of [the treating physician's] assessments the ALJ accepted and which he rejected in formulating his RFC determination.  For example, [the treating physician] consistently concluded that [the] [p]laintiff's recurrent hypoglycemic episodes would require her to take unexpected breaks during the work day, be absent from work several times per month, and generally prevent her from maintaining a normal work schedule.  The ALJ presumably rejected these aspects of the treating physician's opinions when reaching his conclusion that [the] [p]laintiff could perform the full range of light work, but the lack of a function-by-function analysis frustrates this [c]ourt's attempt to determine the basis for the decision and the effort to determine whether the conclusion is otherwise supported by substantial evidence.  Accordingly, the ALJ's RFC determination [ ] cannot be sustained.

<u>Id.</u> at *7.  Similarly, while the Court can assume that the ALJ rejected Dr. Benatar's opinions

concerning absences, unscheduled breaks and lifting limitations, without elaboration by the ALJ,

the Court is unable to determine the reasons for his RFC assessment.  As such, on remand, the

ALJ should fully explain the reasons for his RFC assessment, which should include a discussion

as to all relevant functions.

The Court also notes that the ALJ erred in referring to the February 5, 2010 RFC

assessment by the SDM as consisting of "[f]indings of fact made by [a] state agency medical

consultant[ ]" that should be "treated as expert opinion evidence from nonexaming sources[.]"

(AR at 16.)  Nothing in the administrative record indicates that SDM Glick was a medical

professional.  Because "a 'single decisionmaker' ('SDM') is not a medical professional[,] [ ]

courts have found that an RFC assessment from such an individual is entitled to no weight as a

medical opinion." Sears v. Astrue, 2:11-CV-138, 2012 WL 1758843, at *6 (D. Vt. May 15, 2012) (collecting cases).

While "any error [an] ALJ may have made in weighing the opinion of [an] SDM [ ] as if he was a medical consultant is harmless" so long as "the ALJ did not heavily rely on this opinion in denying benefits[,]" id., in the Court's view, the ALJ did significantly rely on the SDM's conclusion in the February 5, 2010 RFC assessment that the Plaintiff could perform light work. Indeed, the ALJ surmised that his RFC assessment was solely "supported by the opinions of the consultative examiner as well as the state agency review analyst," which was the SDM. (AR at 16.) Therefore, the Court directs the ALJ on remand to be mindful that the February 15, 2010 RFC assessment was generated by a nonmedical source and should not be granted the same weight as an expert opinion from a nonexamining medical consultant.

### E. As to Whether the ALJ's Credibility Finding was Supported by the Substantial Evidence

In addition, the Plaintiff contends that the ALJ's credibility determination was improper because the ALJ never considered the factors set forth in 202 C.F.R. § 404.1529 while assessing the Plaintiff's credibility. Specifically, the ALJ found "that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ ] residual functional capacity assessment" that the Plaintiff could perform light work. (AR at 15. ) Further, the ALJ stated that "[i]n terms of the [Plaintiff's] alleged inability to work due to an ACL tear of the right knee and arthritis, the evidence shows he has pain and stiffness with some restriction of activities, but none that would preclude him from performing at least light work." (AR at 16.)

The ALJ also added that "[i]n terms of the [Plaintiff's] inability to sit for prolonged periods, he testified that he sits comfortably to drive and uses his right leg." (AR at 16.)

"[A] claimant's subjective report of [his] symptoms is not controlling but must be supported by medical evidence." Vilardi v. Astrue, 447 F. App'x 271, 272 (2d Cir. 2012) (quoting 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529). If the pain is not substantiated by objective medical evidence, the ALJ engages in a credibility inquiry, which

> implicates seven factors to be considered, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. § 404.1529(c)(3)(i)–(vii).

Meadors, 370 F. App'x 179, 183 n.1 (2d Cir. 2010).

Here, the ALJ erred in two significant ways when he made his credibility finding with respect to the Plaintiff. First, "[i]n a formulation that suggested a clear violation of [the] rule [requiring an ALJ to assess the credibility of a claimant's statements and only then go on to determine his RFC], the ALJ announced his RFC assessment and then wrote that [the Plaintiff] statements were not credible to the extent they were inconsistent with that RFC assessment." Maldonado v. Commissioner of Social Sec., No. 12–CV–5297 (JO), 2014 WL 537564, at *17 (E.D.N.Y. Feb. 14, 2014) (citing Otero v. Colvin, No. 12–CV–475, 2013 WL 1148769, at *7 (E.D.N.Y. Mar.19, 2013)). "While it is of course possible that the ALJ had made credibility determinations about each of [the Plaintiff's] assertions and used those determinations in crafting his RFC, the more natural reading of the ALJ's opinion is that the ALJ determined the kind of

work he believed [the Plaintiff] could do, and then as a result of that determination rejected any assertion [the Plaintiff] had made to the contrary." Id.

"Court[s] have repeatedly rejected" the "use of a shorthand credibility determination" involving ALJ's employing "the same 'to the extent . . . inconsistent' formulation" present here. Id. (collecting cases). Rather, an ALJ is required to "assess a [claimaint's] credibility before determining his RFC and identify which statements about the intensity and persistence of his symptoms are consistent with specifically identified evidence in the record," as well as "specify those statements [that the ALJ determines are inconsistent with medical evidence in the record] and explain why he chooses to discredit them with reference to the applicable regulatory factors." Id. (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)). See also Romanelli v. Astrue, No. CV–11–4908 (DLI ), 2013 WL 1232341, at *11 (E.D.N.Y. Mar. 26, 2013); Smollins v. Astrue, No. 11–CV–424 (JG), 2011 WL 3857123, at *10–11 (E.D.N.Y. Sept. 1, 2011).

Second, "the ALJ failed to consider all of the seven credibility factors pursuant to 20 C.F.R. § 404.1529(c)(3)(i)-(vii)," which also represents a serious flaw in the ALJ's credibility determination. Pereyra v. Astrue, No. 10–cv–5873 (DLI), 2012 WL 3746200, at *15 (E.D.N.Y. Aug. 28, 2012). Specifically, since "[t]he ALJ did not explicitly refer to or discuss any of the factors listed in 20 C.F.R. 404.1529(c)(3)[,]" his ""credibility analysis was insufficient." Kane v. Astrue, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013). Indeed, the ALJ made no reference and apparently gave no consideration to the Plaintiff's daily activities; how frequently and intensely he experiences pain and other symptoms in his knee; the medications the Plaintiff was taking; and his physical therapy and home exercise programs. "Moreover, 'the ALJ did not identify what facts he found to be significant, indicate how he balanced the various factors, or specify which of [the] Plaintiff's alleged symptoms he found to be not credible.'" Mantovani v. Astrue,

No. 09–CV–3957 (RRM), 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31, 2011) (citing <u>Simone v.</u>

<u>Astrue</u>, No. 08–CV–4884, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009)). "The ALJ's

lack of specificity and failure to meet [SSA] requirements for evaluating the credibility of [the]

Plaintiff's subjective complaints require remand."  <u>Kane</u>, 942 F. Supp. 2d at 314; <u>see also</u>

<u>Mantovani</u>, 2011 WL 1304148, at *5 ("This failure to comply with the regulatory requirements

for evaluating Plaintiff's credibility [ ] requires remand.")  (citing <u>Berry v. Schweiker</u>, 675 F.2d

464, 469 (2d Cir. 1982)).

Accordingly, the Court finds that the ALJ committed legal error in his assessment of the

Plaintiff's credibility.  On remand, the Court directs the ALJ to consider the Plaintiff's credibility

prior to making his RFC assessment and to discuss the seven factors listed in 20 C.F.R.

404.1529(c)(3) while rendering his credibility determination.

**F. As to Whether the Court Should Remand for an Award of Benefits**

Lastly, the Plaintiff argues that because the ALJ's findings that the Plaintiff can perform

light work cannot be sustained, the "Court should either (1) apply Grid Rule 201.10 which

directs a finding of disability for an individual with the same vocational factors as found by the

ALJ, but who is limited to sedentary work rather than light work; or [in the alternative,]

(2) remand with instructions to obtain vocational expert testimony."  (Pl. Mem., pg. 22.)  In this

regard, the Plaintiff claims he "met his burden of proof at step four of the sequential evaluation

process of showing that he cannot return to his past relevant work as a carpenter/foreman," so

that "the burden of proof shifted to the [ALJ] to prove that he is capable, considering his age,

education and past work experience, of engaging in other work."  (Pl. Mem., pg. 21.)

As to the first suggested approach, the Plaintiff asserts that a finding of disability is

required by Grid Rule 201.10, and thus, the Court should remand with instructions to award

benefits.  However, "[o]n this record, the Court cannot conclude that there is persuasive proof of disability such that remand would serve no useful purpose."  Pereira v. Astrue, 279 F.R.D. 201, 209 (E.D.N.Y. 2010).  Indeed, "[w]ith the proper legal standard applied, the facts could support a conclusion of either disabled or not disabled."  Id.  As such, the Court denies the Plaintiff's motion to the extent the Plaintiff seeks an order from this Court directing a finding of disability and remand for an award of benefits at this time.  See Maldonado, 2014 WL 537564, at *18 ("Remand solely for the calculation of benefits is not warranted in this case. A remand for calculation of benefits is appropriate only when application of the correct legal standard 'could lead to but one conclusion.'") (quoting Gonzalez v. Astrue, No. 04-CV-3437 (JG), 2008 WL 755518, at *9 (E.D.N.Y. Mar. 20, 2008)).

With respect to the Plaintiff's alternative request, the Plaintiff contends the Grid Rules are not controlling since the Plaintiff suffers from non-exertional limitations, and therefore, the Court should direct the ALJ to obtain vocational expert testimony.  "Because the ALJ failed to properly assess [Dr. Benatar's] opinions under the treating physician rule, it is unclear whether [the] Plaintiff's non-exertional impairments and alternating sit-stand requirement are limitations which should have been included in the final RFC assessment."  Shaver v. Commissioner of Social Sec., No. 7:05-CV-1162 (LEK/RFT), 2008 WL 2704355, at *6 (N.D.N.Y. July 2, 2008).  Thus, "[o]n remand, if Plaintiff is found to have significant non-exertional limitations, the ALJ is directed to obtain vocational expert testimony to aid in determining whether he can perform his past relevant work or other work existing in significant numbers in the national economy."  Id. (citing Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir.1999)).

### III. CONCLUSIONS

For the foregoing reasons, it is hereby:

**ORDERED**, that the Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is denied; and it is further

**ORDERED**, that the Plaintiff's cross-motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is granted in part and denied in part; and it is further

**ORDERED**, that this case is remanded to the ALJ for another hearing consistent with this Memorandum of Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
　　　 March 14, 2014　　　　　　　　　　　_____*/s/ Arthur D. Spatt*_____
　　　　　　　　　　　　　　　　　　　　　　　ARTHUR D. SPATT
　　　　　　　　　　　　　　　　　　　　　　United States District Judge